UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:                                                        Case No. 09-36379-EPK
                                                              Chapter 11
Palm Beach Finance Partners, L.P. and
Palm Beach Finance II, L.P.,

       Debtor(s).

_____/

Barry E. Mukamal, as Liquidating Trustee,

       Plaintiff,

                                      Adversary Pro. No. 11-02940-EPK

v.

The National Christian Charitable Foundation, Inc.,

       Defendant.

_____/

## NOTICE OF CROSS-APPEAL

The National Christian Charitable Foundation, Inc., d/b/a National Christian Foundation ("NCF"), pursuant to 28 U.S.C. § 158(a), Fed. R. Bankr. P. 8003 and 8016, and Local Rule 8003-1, files this Notice of Cross-Appeal to the United States District Court for the Southern District of Florida.  NCF appeals the Bankruptcy Court's (i) Order on Competing Motions for Summary Judgment as to Which State's Law Applies to Fraudulent Transfer Claims [ECF No. 100] ("Choice of Law Order") and (ii) Final Judgment [ECF No. 299], which necessarily encompasses the earlier Choice of Law Order.

This cross-appeal is conditional:  NCF's appeal of the Choice of Law Order need only be heard *if* the District Court reverses the Bankruptcy Court's grant of summary judgment to NCF on Count 1 of the Trustee's Complaint.

Copies of the Order and Final Judgment appealed from are attached as Exhibits 1 and 2, respectively, in accordance with Fed. R. Bankr. P. 8003(a)(3)(B).

**Part 1: Identify the [cross-]appellant.**

1.     Name of Cross-Appellant:  The National Christian Charitable Foundation, Inc., d/b/a National Christian Foundation.

2.     Position of cross-appellant in the adversary proceeding that is the subject of this appeal:  Defendant.

**Part 2: Identify the subject of this appeal.**

1.     Describe the judgment, order, or decree appealed from:

(a)     Order on Competing Motions for Summary Judgment as to Which State's Law Applies to Fraudulent Transfer Claims [ECF No. 100]; and

(b)     Final Judgment [ECF No. 299].

2.     State the date on which the judgment, order, or decree was entered:

(a)     December 10, 2014; and

(b)     March 20, 2019.

**Part 3: Identify the other parties to the appeal.**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys:

1.     Party:  Barry E. Mukamal ("Plaintiff"), in his capacity as Liquidating Trustee for the Palm Beach Finance Liquidating Trust and the Palm Beach Finance II Liquidating Trust.

Counsel:

James C. Moon, Esq.
jmoon@melandrussin.com

2

Peter D. Russin, Esq.
prussin@melandrussin.com

MELAND RUSSIN & BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363

**Part 4: N/A**

**Part 5: Sign below.**

Dated April 15, 2019.

Respectfully submitted,

**FISHERBROYLES, LLP**

By: _/s/ David J. Myers_____
David J. Myers
GA Bar No.: 533072 (admitted *pro hac vice*)

950 W. Bannock Street, Suite 1100
Boise, Idaho 83607
404-825-3907 (o)
david.myers@fisherbroyles.com

Leanne Prendergast
Florida Bar No. 59544

2620 Beach Blvd, Ste. 3 #126
Jacksonville FL 32246
(904) 242-6401
leanne.prendergast@fisherbroyles.com

**SHRAIBERG, FERRARA & LANDAU, P.A.**

Bradley S. Shraiberg, Esq.
Florida Bar No. 121622
Patrick Dorsey, Esq.
Florida Bar No. 121622

2385 NW Executive Center Drive, Suite 300
Boca Raton, Florida 33431

3

Telephone: 561-443-0800
Facsimile: 561-998-0047
bshraiberg@sfl-pa.com

Attorneys for National Christian Foundation, Inc.

4

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via

Notice of Electronic Filing to those parties registered to receive electronic filings on this the 15th

day of April, 2019.

By: _/s/ David J. Myers_____
David J. Myers



ORDERED in the Southern District of Florida on December 10, 2014.

Paul G. Hyman, Jr.
**Chief United States Bankruptcy Judge**

---

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

In re:  CASE NO.: 09-36379-BKC-PGH

**Palm Beach Finance Partners, L.P.**  Chapter 11 (jointly administered)
**and Palm Beach Finance II, L.P.,**
        Debtors.                                    /

**Barry Mukamal,**  ADV. NO.: 11-2940-BKC-PGH-A
        Plaintiff,

v.

**The National Christian**
**Foundation, Inc.,**
        Defendant.                              /

## ORDER ON COMPETING MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 63 AND 70) AS TO WHICH STATE'S LAW APPLIES TO FRAUDULENT TRANSFER CLAIMS

**THIS MATTER** came before the Court upon the *Motion for Partial Summary Judgment Regarding Choice of Law* (the "Plaintiff's Motion") (ECF No. 63) filed by Barry Mukamal (the "Plaintiff") and the *Motion for Summary Judgment* (the "Defendant's Motion") (ECF No. 70) filed by the National Christian Foundation,

1

Inc. (the "Defendant"). For the reasons discussed below, the Court grants the Plaintiff's Motion and denies the Defendant's Motion as to the choice of law issue.

## UNDISPUTED FACTS

The following represent the undisputed facts[1] which are relevant for the purposes of the Court's choice of law analysis.

## I.  The Petters Ponzi scheme and the Debtors' chapter 11 filing

In 1995, Frank Vennes founded Metro Gem, Inc. ("MGI") and was at all times its owner and CEO. Starting in or about 1995 and continuing through September 2008, Mr. Vennes, through MGI, raised money from investors to invest in Petters Company, Inc. ("PCI"), the company founded by Thomas J. Petters. Indeed, from 2005 through 2008, MGI's primary business was obtaining funds from third parties for investment in PCI notes. The transactions underlying the PCI notes, however, were fictitious, and PCI's inventory finance operation was nothing more than a Ponzi scheme.

After the implosion of the Petters Ponzi scheme, Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P. (the "Debtors"), both of which were heavily invested in PCI, filed for chapter 11 bankruptcy protection. Their chapter 11 cases are pending in this Court, which retains jurisdiction relating thereto. *See* Case No. 09-36379-BKC-PGH (jointly administered). The offices of the Debtors were at all times located in Florida. The Debtors' liquidating trusts were formed in

---

[1] The Plaintiff, in his Motion for Summary Judgment, and the Defendant, in its *Statement of Material Facts in Support of Motion for Summary Judgment* (ECF No. 72), each provide a statement of undisputed facts. The Court thus extracted the relevant undisputed facts from the facts which are contained in both statements.

2

accordance with a plan of liquidation filed in and confirmed by order of this Court and are governed by Florida law. *See* Case No. 09-36379, ECF No. 246; ECF No. 246-2, p. 70; 97. The Plaintiff is a Florida resident appointed by this Court as liquidating trustee to oversee the liquidation of the Debtors, and his principal place of business is in Florida. *See id*.

## II.   The Defendant and its relationship with Fidelis, Vennes, and MGI

The Defendant, which is the nation's largest provider of donor-advised funds ("DAFs"), was founded in Atlanta in 1982 and was incorporated in Georgia. The Defendant is now, and has been at all times since its inception, a Georgia non-profit corporation. The Defendant has, and has always maintained, its headquarters and principal place of business in Georgia. The following are true as to the Defendant's business operations: (1) its main operations occur in Georgia; (2) its computer systems are housed in Georgia; (3) it receives funds into and sends funds out of its bank accounts in Georgia; and (4) its Board of Directors meets at its headquarters in Georgia.

Mr. Vennes and his company, MGI, were major donors to Fidelis Foundation ("Fidelis"). In March 2005, Fidelis opened the Fidelis Foundation Giving Fund (the "Fidelis Fund") with the Defendant through an initial contribution of $400,000, which was deposited in the Defendant's bank account in Georgia. Thereafter, the Defendant sent quarterly reports regarding the Fidelis Fund to Fidelis in Minnesota. In April 2005, Fidelis representatives visited the Defendant's offices in Atlanta. The Fidelis representatives requested that the Defendant receive the next

3

major gift from Fidelis's primary donor, Mr. Vennes, through a DAF to be set up by Mr. Vennes, and that the Defendant then distribute the gift to Fidelis based on Mr. Vennes' recommendation.

By letter dated December 30, 2005, the Defendant received, at its offices in Georgia, a giving fund application (the "Vennes Fund Application") and a $4,000,000 MGI check to open a DAF. Upon receipt of the Vennes Fund Application, the Defendant opened a DAF fund titled the Vennes Charitable Fund (the "Vennes Fund").

## III.   The transfers

MGI issued the $4,000,000 check to open the Vennes Fund (the "First Transfer") in December 2005. This check was drawn on MGI's account at Eagle Crest Capital Bank ("ECCB"), a division of Home Federal Savings Bank, located in Rochester, Minnesota. The Defendant deposited the First Transfer into the Defendant's contribution account at its bank in Georgia (the "NCF Account"). Less than a week later, the Defendant wired $3,985,000 of those initial funds to Fidelis.

On September 27, 2006, MGI made a second transfer to the Defendant, when it wired $610,000 from its account at ECCB in Minnesota to the NCF Account (the "Second Transfer"). The next day, the Defendant wired $600,000 to Fidelis.

On October 2, 2006, MGI made a third transfer to the Defendant, when it wired $400,000 from its account at ECCB in Minnesota to the NCF Account (the "Third Transfer"). The next day, the Defendant wired $400,000 to Fidelis.

On December 19, 2006, MGI made a fourth transfer to the Defendant, when it wired $4,000,000 from its account at ECCB in Minnesota to the NCF Account (the "Fourth Transfer," and collectively with the First Transfer, the Second Transfer and the Third Transfer, the "Transfers"). The next day, the Defendant wired $4,000,000 to Fidelis.

## CONCLUSIONS OF LAW

### I.   Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.

### II.   Choice of law

At this stage in the proceedings, the Court will only consider the choice of law issue[2] raised in the parties' competing Motions for Summary Judgment.[3] The

---

[2] In accordance with its August 27, 2014, *Order on Motion to Strike Portions of Defendant's Motion for Summary Judgment* (ECF No. 78), the Court reserves ruling on Sections II and III of the Defendant's Motion for Summary Judgment until such time as the Court has ruled on the choice of law issue and either: (1) fact discovery as to Sections II and III has closed and the parties agree to a briefing schedule relating thereto; or (2) this Court, upon an appropriate motion, grants leave to seek summary judgment as to Sections II and III.

[3] Pursuant to Federal Rule of Civil Procedure 56(a), made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7056, the Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "When deciding summary judgment, the Court may look to materials in the record such as depositions, documents, affidavits or declarations, and admissions." *Certain Interested Underwriters at Lloyd's, London v. AXA Equitable Life Ins. Co.*, 10-62061-CV, 2013 WL 5948107, at *3 (S.D. Fla. Nov. 7, 2013), *as corrected* (Nov. 12, 2013) (*citing* Fed. R. Civ. P. 56(c)). The Court "'must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party.'" *Diaz v. Amerijet Int'l, Inc.*, 872 F. Supp. 2d 1365, 1368 (S.D. Fla. 2012) (*quoting Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997)); *see also Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013). Finally, the moving party "always bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91

5

Plaintiff asserts that the Uniform Fraudulent Transfer Act ("UFTA") of either Florida or Georgia applies to his fraudulent transfer claims. In contrast, the Defendant asserts that Minnesota's UFTA applies to the Plaintiff's fraudulent transfer claims. Although fundamentally, the UFTA laws of these three states are nearly identical, Minnesota law differs from Florida and Georgia law in one potentially critical way with respect to the Plaintiff's claims.

The Minnesota legislature amended its UFTA in 2012 to include the following exception from the definition of the term "transfer":

> "Transfer" does not include a contribution of money or an asset made to a qualified charitable or religious organization or entity unless the contribution was made within two years of commencement of an action under sections 513.41 to 513.51 against the qualified charitable or religious organization or entity and:
>
> > (i) the debtor made the charitable contribution with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> >
> > (ii) the debtor:
> >
> > > (A) was insolvent at the time of the contribution or would be rendered insolvent by reason of the contribution;
> > >
> > > (B) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > >
> > > (C) intended to incur, or the charitable or religious organization or entity believed or had reason to believe that the debtor would incur, debts beyond the debtor's ability to pay as the debts become due.
>
> A transfer of a charitable contribution to a qualified charitable or religious organization or entity is not considered a transfer covered under item (ii) if the amount of that contribution did not exceed 15

L.Ed.2d 265 (1986); *see also Josendis v. Wall to Wall Residence Repairs, Inc*., 662 F.3d 1292, 1314-15 (11th Cir. 2011).

percent of the gross annual income of the debtor for the year in which the transfer of the contribution was made; or the contribution exceeded that amount but the transfer was consistent with practices of the debtor in making charitable contributions.

Transfer does include a return on investment made by a qualified charitable or religious organization or entity. "Qualified charitable or religious organization or entity" means an organization or entity described in United States Code, title 26, section 170(c)(1), (2), or (3).

Minn. Stat. § 513.41(12) (hereinafter referred to as the "Minnesota's Charitable Contribution Exception"). Minnesota's Charitable Contribution Exception applies retroactively.[4] Although Florida and Georgia both passed amendments enacting similar charitable contribution exceptions in 2013,[5] neither Florida's amendment nor Georgia's amendment applies retroactively. Accordingly, only Minnesota's Charitable Contribution Exception could potentially apply to bar the Plaintiff's claims.

Because of the difference between the laws of Florida, Georgia, and Minnesota, the Court must conduct a choice of law analysis and determine which state's law applies to the Plaintiff's claims. As the Court has previously held, the

---

[4] On April 3, 2012, the Governor of Minnesota signed into law Minnesota's Charitable Contribution Exception. *See* 2012 Minn. Sess. Law Serv. Ch. 151 (H.F. 1384). The law provided that the amendment to Minn. Stat. § 513.41(12) "is effective the day following final enactment and applies to a cause of action *existing on*, or arising on or after, that date." *Id.* (emphasis added).

[5] On June 14, 2013, the Governor of Florida signed into law a revision to Florida Statute § 726.109(7), which provided a charitable contribution defense to fraudulent transfer claims. *See* 2013 Fla. Sess. Law Serv. Ch. 2013-189 (C.S.H.B. 95). Similarly, on May 7, 2013, the Governor of Georgia signed into law § 18-2-81 of the Official Code of Georgia, which shortened the statute of limitations for a fraudulent transfer civil action with respect to a transfer to a charitable organization to two years. *See* 2013 Georgia Laws Act 328 (S.B. 105). However, neither law contains a provision applying the amendment retroactively. Pursuant to well-settled Georgia law, there must be a "clear indication in the statutory text that a statute is to be applied retroactively before so applying it." *Deal v. Coleman*, 751 S.E.2d 337, 342 (Ga. 2013). The same is true under Florida law: "It is a well-established rule of construction that in the absence of clear legislative expression to the contrary, a law is presumed to operate prospectively." *State v. Lavazzoli*, 434 So.2d 321, 323 (Fla. 1983).

"diversity jurisdiction approach" is the appropriate approach for bankruptcy courts to follow when determining which state's law applies to a particular issue.[6] "Under the diversity jurisdiction approach, bankruptcy courts borrow from the 'law applicable in diversity cases to hold that the forum state's choice of law rules are imposed on bankruptcy adjudications where the underlying rights and obligations are defined by state law.'" *Dzikowski v. Friedlander (In re Friedlander Capital Mgmt. Corp.),* 411 B.R. 434, 441-42 (Bankr. S.D. Fla. 2009) (*quoting Marine Midland Bank v. Portnoy, (In re Portnoy)*, 201 B.R. 685, 697 (Bankr. S.D.N.Y. 1996) (citation omitted)); *see also, PNC Bank, N.A. v. Rolsafe Int'l, LLC (In re Rolsafe Int'l, LLC)*, 477 B.R. 884, 902 n. 14 (Bankr. M.D. Fla. 2012). Accordingly, because this Court sits in Florida, Florida's choice of law rules govern the choice of law issue now before the Court.

## A. Fraudulent transfer actions sound in tort

To begin with, the Court must establish whether, pursuant to Florida law, fraudulent transfer actions sound in tort, in equity, or even in contract, as different

---

[6] In *Mukamal v. Cosmos (In re Palm Beach Finance Partners, LP.)*, Case No. 11-02970-BKC-PGH-A (ECF No. 59) (July 30, 2013), the Court noted that "[c]ourts are divided on the issue of whether bankruptcy courts should apply federal choice of law rules or the choice of law rules of the forum state when conducting a choice of law analysis." *Id*. at 23 (citations omitted). The Seventh Circuit explained the reason behind this split:

> When a federal court sits in diversity, it generally applies the choice-of-law rules of the state in which it sits. . . . However, a federal bankruptcy court's jurisdiction does not arise from diversity, but from federal bankruptcy law, which has a goal of national uniformity rather than congruence with state law. Yet state law governs the validity of most property rights, and except when the bankruptcy code specifies otherwise, bankruptcy courts must apply the relevant state law. . . .Thus, there is a tension as to whether bankruptcy courts follow federal common law choice-of-law principles or the forum state's choice-of-law principles.

*Jafari v. Wynn Las Vegas, LLC (In re Jafari)*, 569 F.3d 644, 648 (7th Cir. 2009).

8

choice of law rules apply to different types of actions. This task is not as simple as it may first seem:

> Classification of fraudulent conveyance [actions] is not a completely straightforward matter. On the one hand, a claim of fraudulent conveyance resembles an action in tort in that the ultimate issue is not whether the conveyance from grantor to grantee was formally valid as a matter of property law, but rather whether it was done for the purposes of defrauding one's creditors. . . . On the other hand, a number of courts have rejected this tort characterization, holding that fraudulent conveyance claims sound in equity because they seek the equitable remedy of voiding a conveyance rather than damages.

*Terry v. June*, 420 F. Supp. 2d 493, 502-03 (W.D. Va. 2006) (internal citations omitted). To further complicate matters, the Court notes that in both Florida and the Eleventh Circuit, there is a surprising dearth of case law analyzing choice of law issues in the context of fraudulent transfer actions.[7] Indeed, the Court could only locate three such cases, all of which are of limited value to the Court's analysis here: (1) *Perkins v. Champagne (In re Int'l Mgmt. Assocs., LLC)*, 495 B.R. 96 (Bankr. N.D. Ga. 2013); (2) *In re Friedlander Capital Mgmt. Corp.*, 411 B.R. 434; and (3) *Alexander v. Delong, Caldwell, Novotny & Bridgers, LLC (In re Terry Mfg. Co., Inc.)*,

---

[7] A 2011 article appearing in the American Bankruptcy Institute Law Review described the choice of law field in the context of fraudulent transfer actions as follows:

> The state of current law was succinctly summarized by a treatise which, in the course of a lengthy analysis of the application of fraudulent transfer law to securitization transactions, devoted the following paragraph to choice of law: "[T]here does not seem to be a universally recognized choice-of-law rule in this area. Consequently, it may be difficult to determine which state's fraudulent conveyance law applies." That is a discreet understatement. "Chaotic" is nearer the mark.

Kenneth C. Kettering, *Codifying a Choice of Law Rule for Fraudulent Transfer: A Memorandum to the Uniform Law Commission*, 19 Am. Bankr. Inst. L. Rev. 319, 338-39 (2011) (*quoting Securitization of Financial Assets* § 5.05[h][1], n.732 (Jason H.P. Kravitt ed., 2d ed. 1995 & Supp. 2010)). The "chaotic" state of the law has not significantly improved since 2011.

9

03-32063 WRS, 2007 WL 1560087 (Bankr. M.D. Ala. May 29, 2007) *vacated and remanded*, 03-32063-WRS, 2008 WL 4493240 (M.D. Ala. Sept. 30, 2008).

Although these three cases are of limited value to the Court's overall choice of law analysis, they do indeed indicate that courts generally treat fraudulent transfer claims as torts for choice of law purposes. For instance, after noting that "[t]he parties have not identified any Georgia cases that deal with choice of law rules in the context of a fraudulent transfer action[] and [that] the Court's independent research has not found any," the court in *In re International Management Associates, LLC* concluded that "[i]n the context of a fraudulent transfer action involving an investor in a Ponzi scheme, . . . the action is more equivalent to a tort claim than to a contract claim." 495 B.R. at 105. Additionally, outside of the Eleventh Circuit, "[a] number of courts have classified fraudulent conveyance claims as torts for purposes of choice-of-law issues*." S.E.C. v. Infinity Grp*. Co., 27 F. Supp. 2d 559, 564 (E.D. Pa. 1998) (*citing RCA Corp. v. Tucker*, 696 F.Supp. 845, 847, 853-54 (E.D.N.Y. 1988); *In re O.P.M. Leasing Serv., Inc.*, 40 B.R. 380, 391-95 (Bankr. S.D.N.Y. 1984)); *see also*, *Warfield v. Carnie*, No. 3:04-CV-633-R, 2007 WL 1112591, at *7 (N.D. Tex. Apr. 13, 2007); *Terry*, 420 F. Supp. 2d at 503. The Court agrees with these courts and concludes that for choice of law purposes, fraudulent transfer actions sound in tort, as the focus of a fraudulent transfer action, like the focus of a traditional tort action, is the transferor's conduct and the injury to the creditor.[8]

---

[8] Courts which hold that fraudulent transfers action sound in equity emphasize that fraudulent transfer actions seek the equitable remedy of voiding a transfer rather than damages. *Terry v. June*,

## B.    Florida's choice of law rules

With respect to substantive choice of law issues for claims sounding in tort, Florida follows the "significant relationships" test outlined in the Restatement (Second) of Conflict of Laws (the "Second Restatement"). *Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1567 (11th Cir. 1990) (*citing Bishop v. Fla. Specialty Paint Co.*, 389 So.2d 999, 1001 (Fla. 1980)); *Kirchman v. Novartis Pharm. Corp.*, 8:06-CV-1787-T-24, 2014 WL 2722483, at *1 (M.D. Fla. June 16, 2014) ("Florida applies the 'significant relationships' approach set forth in the Restatement (Second) of Conflict of Laws (1971) to determine choice-of-law questions for tort issues."). However, before the Court begins this significant relationships analysis, the Court must "determine whether a conflict of laws truly exists." *Estate of Miller ex rel. Miller v. Thrifty Rent-A-Car Sys., Inc.*, 609 F. Supp. 2d 1235, 1244 (M.D. Fla. 2009) (citations omitted); *see also, Howard v. Kerzner Int'l Ltd.*, 12-22184-CIV, 2014 WL 714787, at *1 (S.D. Fla. Feb. 24, 2014); *Hoy v. Sandals Resorts Int'l, Ltd.*, No. 11-24580-CIV, 2013 WL 6385019, at *3 (S.D. Fla. Dec. 6, 2013) (noting that "[a] court need only undertake a complete choice of law analysis if a true conflict exists").

## C.    False conflict analysis

The Plaintiff contends that the Defendant's argument that Minnesota law applies creates only a false conflict of law. Particularly, the Plaintiff contends that the purported conflict is a false one because Minnesota does not have an interest in this proceeding as the policy underlying Minnesota's Charitable Contribution

---

420 F. Supp. 2d 493, 502-03 (W.D. Va. 2006). This Court, however, finds that this equitable characteristic is subordinate to primary aim of fraudulent transfer law: to compensate creditors who have been victimized by fraudulent conduct.

11

Exception would not be furthered by its application. The Defendant, on the other hand, asserts that a true conflict does indeed exist because MGI, the non-party transferor, is located in Minnesota, initiated the transfers from its principal place of business in Minnesota, and used ECCB, a bank located in Minnesota, to accomplish the Transfers. Notwithstanding MGI's connections to Minnesota, the Court finds that a false conflict does indeed exist.

A "false conflict" between laws can exist: (1) where the laws of the different states are the same; (2) where the laws of the different states are different but would produce the same outcome under the facts of the case; or (3) when the policies of one state would be furthered by application of its laws while the policy of the other state would not be advanced by application of its laws. *Id.* (citation omitted); *Estate of Miller*., 609 F. Supp. 2d at 1244 (*citing Tune v. Philip Morris Inc*., 766 So.2d 350, 352 (Fla. 2d DCA 2000)). "In contrast, a true conflict exists when two or more states have a legitimate interest in a particular set of facts in the litigation and the laws of those states differ or would produce a different result." *Id*. Here, the Plaintiff asserts that the Defendant's contention that Minnesota law applies produces the third type of false conflict.

The general policy underlying all fraudulent transfer laws is the same: protecting creditors from fraudulent transfers and providing creditors a means of redress when a fraudulent transfer occurs. *MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant Corp.)*, 675 F.3d 530, 537 (5th Cir. 2012); *Finn v. Alliance Bank*, 838 N.W.2d 585, 599 (Minn. Ct. App. 2013), *review granted* (Nov. 12, 2013). The

12

more narrow policy underlying Minnesota's Charitable Contribution Exception, which is the particular law the Defendant seeks to apply here, is the protection of Minnesota charities from liability for certain fraudulent transfers. Minnesota's Charitable Contribution Exception is an example of what the Eleventh Circuit Court of Appeals has described as a "loss distribution" rule.

"Loss distribution" rules, as opposed to "conduct regulation" rules,[9] "prescribe how liability is to be apportioned in a legal action, such as a limitation on damages." *Estate of Miller,* 609 F. Supp. 2d at 1244 (*citing Judge*, 908 F.2d at 1572 n. 9). "[A] sovereign's interest in applying a 'loss-distribution' rule turns not on the site of the incident but *on the people involved in the incident.*" *Id.* (emphasis added) (*citing Judge*, 908 F.2d at 1572 n. 9). Indeed, Courts routinely hold that a state's interests in applying a "loss distribution" rule will not be furthered by application of that state's law if the defendant is not a citizen of that state. *Foster v. U.S.*, 768 F.2d 1278, 1283 (11th Cir. 1985) ("Limiting potential beneficiaries limits recovery. The only purpose is to protect defendants. . . . Thus, a limit on recovery should not be applied when there is no domiciliary defendant because it advances no policy behind the limitation."); *Schippers v. U.S.*, 715 F.3d 879, 890 (11th Cir. 2013) (same); *Walker v. Paradise Grand Hotel, Ltd.*, 01-3564-CIV, 2003 WL 21361662, at *5 (S.D. Fla. Apr. 25, 2003) *aff'd*, 107 F. App'x 894 (11th Cir. 2004) (concluding that because "Defendant is neither a domiciliary nor a resident of Maryland," application of

---

[9] "Conduct regulation" rules "prescribe substantive standards for people to observe, such as a 'rule of the road.'" *Estate of Miller*, 609 F. Supp. 2d at 1244 (*citing Judge*, 908 F.2d at 1572 n. 9). In contrast to "loss distribution" rules, a state's interest in applying a "conduct regulation" rule will "usually be triggered whenever the regulated conduct or the injury occurs in the state." *Judge*, 908 F.2d at 1572 n. 9).

Maryland's damages cap "would not further Maryland's policy of protecting domiciliary defendants"); *Janvey v. Alguire*, No. 3:09-CV-0724-N, 2013 WL 2451738, at *3-*4 (N.D. Tex. Jan. 22, 2013), *aff'd sub nom., Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014).

Here, Minnesota's policies would not be advanced by application of Minnesota law. The Defendant is not incorporated under the laws of Minnesota and does not have its principal place of business in Minnesota. Because Minnesota's Charitable Contribution Exception is a "loss distribution" rule and because the Defendant in this action is not a Minnesota corporation, Minnesota's policy of limiting the fraudulent transfer liability of certain defendants would not be furthered by application of Minnesota's Charitable Contribution Exception. Likewise, neither the Plaintiff nor the Debtors have their principal place of business in or are domiciliaries of Minnesota. Thus, not even the general policy behind Minnesota's UFTA—protecting creditors from fraudulent transfers—would be advanced by application of Minnesota law. Additionally, the creditors of the Debtors, who would ultimately benefit from any funds recovered in this adversary proceeding, are not predominantly located in Minnesota or any other one state. To the extent the Plaintiff represents these creditors, his contacts do not favor any particular state, and the policies of Minnesota would not be significantly advanced by application of Minnesota law.

In contrast, the policies of both Florida and Georgia would be advanced by application of their respective laws. The same general policy underlies both

Florida's and Georgia's UFTA—protecting creditors from fraudulent transfers. Florida's policy interests would certainly be advanced by application of its law as the Debtors, who are the purported creditors of the transferor, were Florida business entities and had their principal places of business in Florida. The Plaintiff, as the Debtors' liquidating trustee who is tasked with pursuing the Debtors' pre-petition causes of action, is also a resident of and has his principal place of business in Florida. Applying Florida's UFTA to this action would advance its interest in protecting its domiciliaries from fraudulent transfers and providing its residents with a means of redress when a fraudulent transfer does occur. Furthermore, Georgia has an interest in applying its UFTA to this action as the Defendant is a Georgia domiciliary, has its principal place of business in Georgia, received the Transfers in Georgia, and deposited the Transfers into its bank account located in Georgia.

The Defendant maintains that it is *not* inevitable that a false conflict exists when no party to the action is a resident of the state whose law is sought to be applied.[10] The Court agrees. However, this does not change the outcome of the Court's false conflict analysis in this proceeding. A state will often have an interest

---

[10] The Defendant also contends that the Plaintiff should be estopped from asserting that some law other than Minnesota applies because the Plaintiff cited Minnesota law as the operative law in his Complaint. However, in his Complaint, the Plaintiff cited Minnesota law "or other applicable law." Not only do courts conduct their own choice of law analyses, but the Plaintiff's citation to "other applicable law" was sufficient to preserve the Plaintiff's claims against the Defendant should a law other than Minnesota's apply. *Court-Appointed Receiver for Lancer Mgmt. Grp. LLC v. Taubman*, 05-60199-CIV, 2007 WL 984452, at *2 (S.D. Fla. Mar. 27, 2007) ("In the Complaint, the Receiver specifically alleges that the transfers are avoidable and recoverable under Florida Statutes 726 and '*other applicable law*' (emphasis supplied). This allegation serves to preserve the Receiver's claims against Taubman in the event the substantive law of some other state governs the Receiver's claims.").

in the outcome of an action even if neither the plaintiff nor the defendant is a resident of that state if the law sought to be applied is a conduct regulation rule, as each state has an interest in regulating conduct within its borders. Here, however, the only relevant difference between the UFTA laws of Florida and Georgia and the UFTA law of Minnesota is Minnesota's Charitable Contribution Exception—a loss distribution rule. As noted above, a state's interests in applying a loss distribution rule will not be furthered by application of that state's law if the defendant is not a citizen of that state because the purpose of a loss distribution rule is to limit the liability of defendants.

In support of his argument that Minnesota has an interest in the action even though no party to the action is a resident of Minnesota, the Defendant cites *Chapman v. DePuy Orthopedics, Inc.*, 760 F.Supp.2d 1310 (M.D. Fla. 2011). In *Chapman,* the court rejected a false conflict argument in the context of a products liability action resulting from a defective medical device and held that Virginia had a legitimate interest in the action even though neither the plaintiff nor the defendant was a Virginia resident. 760 F.Supp.2d at 1312-13. The *Chapman* court, however, conducted only a cursory analysis,[11] the entirety of which follows:

> A comprehensive conflict-of-law analysis is required if the case involves a true conflict between the jurisdictions with an interest in the case. A true conflict exists when two or more states have a legitimate interest in a particular set of facts in litigation and the laws of those states differ or would produce a different result. The Court finds that issues of liability and damages for patients that receive medical care and products in Virginia, from Virginia physicians, and

---

[11] In fact, it would appear from this analysis alone that the court was considering a false conflict issue in the context of a *medical malpractice action*, rather than a products liability action, in which the physician and the medical procedure at issue were both located in Virginia.

> then continue to treat with those physicians in Virginia, give Virginia
> a legitimate interest in this case and its result.

*Id.* at 1313 (internal citations and quotation marks omitted). The analysis is simply too brief to be helpful here. Moreover, the *Chapman* case is factually distinguishable. In *Chapman*, the plaintiff and her doctors were residents of Virginia at the time the medical device at issue was surgically implanted. *Id.* at 1312. Additionally, the plaintiff's "follow-up care occurred in Virginia . . . [e]ven after [she] moved to Florida," and upon detection of the plaintiff's injury, the plaintiff "[r]eturned immediately to Virginia to treat the injury." *Id.* at 1314. In fact, "[t]he only significant contact with Florida is that the injury manifested itself and was discovered in Florida" while the Defendant was a Florida resident. *Id.* The *Chapman* court's analysis would thus be instructive *only if* the facts here were different—for example, if the Debtors were residents of Minnesota at the time of the Transfers and only later relocated to Florida. Therefore, considering the brevity of *Chapman*'s false conflict analysis and the factual dissimilarity of *Chapman* to the matter now before the Court, the *Chapman* opinion is unpersuasive.

As stated above, a false conflict of law exists when the policies of one state would be furthered by application of its laws while the policy of the other state *would not* be advanced by application of its laws. Here, the Court finds that a false conflict exists between the laws of Minnesota and the laws of Florida or Georgia because the policy interests of Minnesota would not be furthered by application of

17

Minnesota law,[12] while the policy interests of both Florida and Georgia would be furthered by application of their respective laws. Because the UFTA laws of Florida and Georgia are not materially different and because the Defendant is a Georgia corporation, the Court will apply Georgia's UFTA law to the Plaintiff's fraudulent transfer actions.

## D. The Second Restatement's significant relationships test

Even if Minnesota had a true interest in the matter here, the Court would still apply the "significant relationships" test and determine, for the reasons discussed fully below, that Georgia law applies.

The "significant relationships" test outlined in the Second Restatement provides as follows:

**Section 145: The General Principle.**

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties *under the principles stated in § 6.*

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred;
(b) the place where the conduct causing the injury occurred;
(c) the domicil, residence, nationality, place of incorporation and place of business of the parties; and

---

[12] The Court notes that even though a "false conflict" exists on the grounds that the policy of Minnesota would not be advanced by application of its laws, it does not mean that Minnesota is entirely disinterested in the matter. Indeed, the first step in a conflicts analysis is to determine which sovereigns are "interested" in the litigation by looking to the factors in Section 145(2) of the Second Restatement. *Hoy v. Sandals Resorts Int'l, Ltd.*, No. 11-24580-CIV, 2013 WL 6385019, at *3 (S.D. Fla. Dec. 6, 2013). It is only after a court has determined which sovereigns are interested that the court will move on to the false conflict step. Here, the Court assumed for the purposes of its analysis that Minnesota is an "interested" sovereign.

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

**Section 6: Choice-of-Law Principles.**

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

  (a) the needs of the interstate and international systems,
  (b) the relevant policies of the forum,
  (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
  (d) the protection of justified expectations,
  (e) the basic policies underlying the particular field of law,
  (f) certainty, predictability and uniformity of result, and
  (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws §§ 6, 145 (1971) (emphasis added). To apply the Second Restatement's significant relationships test, "a court first examines the 'General [Tort] Principle' in section 145 and then uses that analysis to 'inform' the court as it applies the general choice of law principles under section 6." *Estate of Miller*, 609 F. Supp. 2d at 1247. Because of the nature of the significant relationships test, courts must engage in a fact-intensive, case-by-case analysis, which is not as simple as "add[ing] up the factors delineated in section 145(2) and then apply[ing] the law of the sovereign with the greatest numerical total." *Judge*, 908 F.2d at 1568. Instead, it is the law of the state with the *most significant* contacts—not just the *most* contacts—which will apply.

19

i.   Section 145(2) contacts

In contrast with standard torts such as battery and negligence, fraudulent transfer actions present a unique challenge for courts engaging in a significant relationships analysis. Due to the nature of the facts underlying fraudulent transfer actions and the policies underlying fraudulent transfer statutes, the relevance of the § 145 contacts is significantly diminished. As the Fifth Circuit Court of Appeals explained:

> [T]he injury in [a fraudulent transfer action] is intangible. Not only does this make it very difficult to assign a meaningful location to the injury, the commentary to the Restatement suggests that when the injury is intangible the importance of this factor is severely diminished. *Cf.* Restatement (Second) of Conflict of Laws § 145 cmt. e (1971). Similarly, . . . it [is] nearly impossible to define what conduct caused the injury and the place where that conduct occurred. Here, it is not necessary to definitively identify or locate the relevant conduct because constructive fraudulent transfer laws are more concerned with helping injured parties than deterring conduct. *Cf.* Restatement (Second) of Conflict of Laws § 145 cmt. c (1971). Because the record indicates that there are relevant parties in [two states], this factor does not favor either state. Finally, there is no one location where the relationship of the parties is clearly centered, and this factor is not particularly relevant on these facts.

*In re Mirant Corp.*, 675 F.3d at 537. Indeed, only one of the § 145(2) contacts—the domicile, residence, nationality, place of incorporation, and place of business of the parties—is particularly relevant to a choice-of-law analysis in the context of a fraudulent transfer action. Restatement (Second) of Conflict of Laws § 145(2)(c). Here, the Plaintiff is a resident of and has his principal place of business in Florida, and the Defendant is incorporated and has its principal place of business in Georgia.

20

ii.    Section 6 factors

Because the § 145(2) contacts are only minimally relevant, the Court must focus its inquiry on the § 6 factors. Of particular importance in the fraudulent transfer context is the relevant policies of the forum state and the other interested states. *In re Mirant Corp*., 675 F.3d at 537. Comment h to the Second Restatement provides that the basic policies underlying the laws at issue are particularly important:

> in situations where the policies of the interested states are largely the same but where there are nevertheless minor differences between their relevant local law rules. In such instances, there is good reason for the court to apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved.

Restatement (Second) of Conflict of Laws § 6 cmt. h.[13] Accordingly, the Court considers each of the § 6 factors, bearing in mind the importance of the basic policies underling the field of fraudulent transfer law.

### a. The basic policy underlying fraudulent transfer law

The Court begins its significant relationships analysis by considering the fifth factor listed in § 6—the basic policy underlying the field of fraudulent transfer law.

Minnesota's Charitable Contribution Exception applies retroactively. Although Florida and Georgia both passed amendments enacting similar charitable

---

[13] Additionally, states which have enacted a version of the UFTA generally have also enacted a "uniformity of application and construction" statute, which provides that the UFTA provisions of that state "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of the law among states enacting it." *See, e.g.*, Fla. Stat. 726.112; Cal. Civ. Code § 3439.11; 740 Ill. Comp. Stat. Ann. 160/12; N.J. Stat. Ann. § 25:2-33 ; Tex. Bus. & Com. Code Ann. § 24.012.

contribution exceptions in 2013, neither Florida's amendment nor Georgia's amendment applies retroactively. The majority of states which have enacted a version of the UFTA have either enacted a non-retroactive exception for certain transfers to charitable entities or have not enacted any exception for charitable entities.[14] Because the differences between the UFTA laws of Minnesota, Georgia, and Florida are minor when considering the entire body of UFTA law, the fifth factor favors "the application of the law that best achieves the basic policy underlying this particular field of law." *In re Mirant Corp.*, 675 F.3d at 537.

As discussed above, the basic policy underlying all fraudulent transfer laws is the protection of creditors from fraudulent transfers. Here, neither Georgia's UFTA nor Florida's UFTA contains a retroactive charitable contribution exception and either state's law would allow the Plaintiff to prosecute his fraudulent transfer action. Minnesota's Charitable Contribution Exception, on the other hand, would likely bar the Plaintiff from prosecuting the action if the Court were to apply Minnesota's UFTA. Accordingly, application of the law of either Florida or Georgia would achieve the basic policy underlying fraudulent transfer law—the protection of creditors from fraudulent transfers—while application of the law of Minnesota would not.

---

[14] Minnesota's Charitable Contribution Exception was made retroactive specifically to protect charitable entities from avoidance actions in brought in connection with the Petter Ponzi scheme, "which helps explain how this <u>non-uniform amendment</u> to the Act made it so rapidly through the Minnesota legislature." Jeffrey Davis, *Choosing Among Innocents: Should Donations to Charities Be Protected from Avoidance As Fraudulent Transfers?*, 23 U. Fla. J.L. & Pub. Pol'y 407, 428 (2012) (emphasis added).

### b. The relevant policies of the forum and other interested states

The second and third factors—(b) the relevant policies of the forum; and (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue—also favor application of either Florida or Georgia law. As to the forum state, the general policy underlying Florida's UFTA is the protection of creditors from fraudulent transfers. Accordingly, the general policy of Florida's UFTA would be best served by application of either Florida or Georgia law. Likewise, the general policies underlying both Georgia's UFTA and Minnesota's UFTA would also be best served by application of either Florida or Georgia law. To the contrary, application of Minnesota's UFTA and its Charitable Contribution Exception would not further the general policy underlying any state's UFTA law. Furthermore, as previously discussed in great detail, the particular policy behind Minnesota's Charitable Contribution Exception would not be served by application of Minnesota law as no defendant to this action is domiciled in Minnesota. The second and third factors thus favor application of either Florida or Georgia law.

### c. Predictability and uniformity

Considered together, the first, fourth, sixth, and eighth factors—(a) the needs of the interstate and international systems; (d) the protection of justified expectations; (f) certainty, predictability, and uniformity of result; and (g) ease in the determination and application of the law to be applied—favor application of Georgia law.

23

"Choice-of-law rules, among other things, should seek to further harmonious relations between states and to facilitate commercial intercourse between them." Restatement (Second) of Conflict of Laws § 6 cmt. d. Here, the needs of the interstate system would be best met by application of either Florida or Georgia law, both of which reflect the approach taken by a majority of the states. Similarly, an application of either Florida or Georgia law would promote the Restatement's goal of uniformity of result.

Moreover, application of Georgia law would better promote certainty, predictability, and ease in the determination of the law to be applied given that it is the law of the state in which the Defendant-transferee is incorporated and has its principal place of business. Applying the law of the state in which the transferee has its principal place of business or is domiciled promotes certainty and predictability for both individuals and corporations who receive transfers as charitable donations or otherwise. This is because these transferees would need only be well-versed in the laws of their own states, rather than the law of various other states whose law might apply several years down the road, when deciding whether to accept certain transfers.

Additionally, in actions in which there are multiple transferee-defendants, "[e]ach transferee is entitled to a separate choice[-]of-law analysis, with a recognition of the transferees' particular contacts with respect to each individual fraudulent transfer action." *Alguire*, 2013 WL 2451738, at *3. Because, in the context of fraudulent transfer actions, the injury is intangible and the focus is

24

generally not on the actions of the defendant-transferee or the relationship between the plaintiff-creditor and the defendant-transferee, the weight of the traditional choice of law contacts is diminished. Courts are then compelled to look to the less concrete factors provided in § 6 of the Second Restatement, such as the various policy considerations of each interested state or country and the needs of the interstate justice system. Indeed, commentators have noted that the "outstanding feature" of the Second Restatement's significant relationships analysis is its "diffuseness":

> It has often been remarked that the result of directing courts to engage in interest analysis in this style is that "each case is decided as if it were unique and of first impression" and that "it is the Restatement's very flexibility and malleability that has made it so attractive to the courts," for it allows them to do whatever they want. That malleability of course undercuts predictability in structuring transactions that may be susceptible to fraudulent transfer attack, and increases litigation costs if such an attack is litigated.

Kenneth C. Kettering, *Codifying a Choice of Law Rule for Fraudulent Transfer*, 19 Am. Bankr. Inst. L. Rev. at 342. Assigning significant weight to the state in which the defendant-transferee is domiciled or has its principal place of business, as the Court is choosing to do here, circumvents a great deal of this uncertainty.

Based on the foregoing, the Court finds that application of Georgia law best promotes predictability and uniformity.

iii.     Application of the Second Restatement's significant relationships test favors Georgia law

Due to the nature of fraudulent transfer actions, the Second Restatement's § 145(2) contacts are minimally relevant. Here, the only relevant contact—the domicile, residence, nationality, place of incorporation, and place of business of the

25

parties—favors application of either Florida or Georgia law. Each of the Second Restatement's § 6 factors likewise favors application of either Florida or Georgia law over Minnesota law. The second, third, and fifth factors favor equally application of either Florida or Georgia law. Relating to the needs of predictability and uniformity, the first, fourth, sixth, and eighth factors favor application of Georgia law over the laws of either Florida or Minnesota. Therefore, even assuming that Minnesota has a true interest in this action, the Court finds that, after conducting a full significant relationships analysis, Georgia law has the most significant relationship to and thus governs the Plaintiff's fraudulent transfer actions.

## III.  Conclusion

Because the Court sits in the state of Florida, Florida's choice of law rules govern the Court's choice of law analysis. When faced with a choice of law issue, Florida law requires that courts first determine whether a true conflict actually exists. If a true conflict does indeed exist, Florida law requires that courts follow the Second Restatement's significant relationships test for actions sounding in tort, such as the Plaintiff's fraudulent transfer actions. For the reasons discussed in detail above, the Court concludes that a false conflict exists here as the policies underlying Minnesota's UFTA, particularly, its Charitable Contribution Exception, would not be furthered by application of Minnesota law. In contrast, the policies underlying Georgia's UFTA *would* be advanced by application of Georgia law. Moreover, even if Minnesota had a true interest in the matter here, the Court

26

concludes, after conducting a thorough significant relationships analysis, that Georgia has the most significant relationship to the matter now before the Court. Therefore, the Court concludes that Georgia law governs the Plaintiff's fraudulent transfer claims.

## ORDER

Having considered the parties' respective Motions and briefs and being other fully advised in the premises, the Court hereby **ORDERS AND ADJUDGES** that:

1. The Plaintiff's *Motion for Partial Summary Judgment* (ECF No. 63) is **GRANTED**.

2. The Court determines that Georgia law applies to the Plaintiff's fraudulent transfer claims.

3. The Defendant's *Motion for Summary Judgment* (ECF No. 70) is **DENIED IN PART**.

4. In accordance with its August 27, 2014, *Order on Motion to Strike Portions of Defendant's Motion for Summary Judgment* (ECF No. 78), the Court reserves ruling on Sections II and III of the Defendant's Motion for Summary Judgment until such time as the Court has ruled on the choice of law issue and either: (1) fact discovery as to Sections II and III has closed and the parties agree to a briefing schedule relating thereto; or (2) this Court, upon an appropriate motion, grants leave to seek summary judgment as to Sections II and III.

###

27

Copies furnished to:

Michael S Budwick, Esq.

David J Myers, Esq.

Bradley S Shraiberg, Esq.



**ORDERED in the Southern District of Florida on March 20, 2019.**



**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| | CASE NO. 09-36379-EPK |
| **Palm Beach Finance Partners, L.P. and** | CASE NO. 09-36396-EPK |
| **Palm Beach Finance II, L.P.,** | (Jointly Administered) |
|     Debtors. | |

_____/

**Barry E. Mukamal, as Liquidating Trustee,**

    Plaintiff,

v.                                       **ADV. PROC. NO.  11-02940-EPK**

**The National Christian Charitable**
**Foundation, Inc., d/b/a The National**
**Christian Foundation, Inc.,**

    Defendant.

_____/

**FINAL JUDGMENT**

    **THIS MATTER** comes before the Court pursuant to Fed. R. Civ. P. 58, made applicable to this

adversary proceeding by Fed. R. Bankr. P. 7058, and this Court's *Order on Cross Motions for Summary*

*Judgment* [ECF No. 241], *Order on Motions for Reconsideration* [ECF No. 259], and *Order Granting Motion for Summary Judgment on Count 1* entered contemporaneously herewith. It is ORDERED AND ADJUDGED that Final Judgment is entered in favor of the Defendant, and all relief requested by the Plaintiff is DENIED.

### 

*Copies to all parties of record.*